Mananghaya v Bronx-Lebanon Hosp. Ctr. (2018 NY Slip Op 06061)





Mananghaya v Bronx-Lebanon Hosp. Ctr.


2018 NY Slip Op 06061


Decided on September 13, 2018


Appellate Division, First Department


Gesmer, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 13, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick,J.P.
Sallie Manzanet-Daniels
Angela M. Mazzarelli
Ellen Gesmer
Jeffrey K. Oing, JJ.


83953/13 83819/13 20191/13 6720 

[*1]Malou Mananghaya, as Administratrix of the Estate of Tristan Michael Mananghaya, et al., Plaintiffs-Appellants,
v
Bronx-Lebanon Hospital Center, Defendant-Respondent, Napoli Transportation, Inc., doing business as C & L Towing Services, Inc., Defendant.
Napoli Transportation, Inc., doing business as C & L Towing Services, Inc., Third-Party Plaintiff,
v
Aggreko, LLC, Third-Party Defendant-Respondent.
The Bronx-Lebanon Hospital Center, Second Third-Party Plaintiff,
[*2]
v
Aggreko, LLC, Second Third-Party Defendant-Respondent.



Plaintiffs appeal from an order of the Supreme Court, Bronx County (Lucindo Suarez, J.), entered on or about May 10, 2017, which, to the extent appealed from as limited by the briefs, denied their motion for partial summary judgment on their Labor Law § 240(1) cause of action as against defendant Bronx-Lebanon Hospital Center and granted the motions for summary judgment of defendants and third-party and second third-party defendant Aggreko, LLC dismissing that cause of action.




Block O'Toole & Murphy, New York (David L. Scher and Christina Mercado of counsel), for appellants.
Ahmuty, Demers & McManus, New York (Glenn A. Kaminska and Nicholas M. Cardascia of counsel), for Bronx-Lebanon Hospital Center, respondent.
O'Connor Redd, LLP, Port Chester (Steven M. O'Connor of counsel), for Aggreko, LLC, respondent.



GESMER, J.


Plaintiffs are the wife and children of decedent Tristan Michael Mananghaya, who was killed while performing work at Bronx Lebanon Hospital Center (the hospital). They seek to recover damages under the Labor Law for his death. The only issue on this appeal is whether the work he was performing constitutes an "alteration" within the meaning of Labor Law § 240(1). We hold that the work he was performing affected the functioning of a crucial building-wide system at the hospital by "changing the way the [hospital buildings] react to . . . the elements" (Belding v Verizon N.Y., Inc., 14 NY3d 751, 753 [2010]), and thus constitutes a "significant physical change to the configuration or composition of the building or structure" (Joblon v Solow, 91 NY2d 457, 465 [1998]), bringing plaintiffs' claim within the protection of Labor Law § 240(1).
Facts
The essential facts established by deposition testimony for the purposes of these summary judgment motions are not in dispute. We consider, inter alia, the deposition testimony of the hospital's senior director of engineering and lead engineer, the technician for third-party defendant Aggreko, LLC, the boom truck operator employed by defendant Napoli Transportation, Inc. d/b/a C & L Towing Services, Inc. (C & L), who was present on the day of the accident, and decedent's coworker present on the day of the accident.
The hospital is required by the agencies that regulate it to maintain certain temperatures. For example, operating rooms must be kept at 62 degrees.
The portion of the hospital at issue consists of three buildings located at 1650 Grand Concourse between 173rd Street and Mount Eden Parkway. The buildings are connected internally and encompass approximately 475,000 square feet. In the warm months, the hospital is cooled by an integrated air conditioning system in which air handling units located in seven mechanical rooms on different floors bring cool air through vents to the entire hospital complex. The fan that blows air through the vents contains a coil through which chilled water flows, which removes humidity and lowers the temperature of air flowing through the system. The water recycles continuously through the system, replenished as needed by the hospital's water supply. As it passes through the coil and cools the air around it, the water gets warmer. It then passes [*3]through a chiller, which lowers the temperature of the water before it reenters the coil.
In 2009, the hospital decided to install a "back-up" or "stand by" system because one of its two chillers had failed in the past, and the hospital was concerned that one chiller would not be sufficient in the warmer months to maintain the required temperatures. The hospital considered placing a third chiller on a hospital roof top, but decided instead to place a rented chiller and generator on the street outside the hospital, because it was less costly to do so.
To accomplish this, in 2009, the hospital leased from Aggreko a 28,000 pound chiller that was to be incorporated into the hospital's air conditioning system. Aggreko worked with subcontractors, including C & L, to deliver the rented chiller and integrate it into the hospital's air conditioning system at the beginning of the summer, and to disconnect and return it in the fall.
The rented chiller sat atop a trailer parked on 173rd Street. In order to incorporate the rented chiller into the hospital's system, permanent T-valves were installed on the chilled water supply and return risers located in the hospital's second floor mechanical room. Two approximately 125 feet long stiff rubber hoses with metal flanges were screwed and bolted into the T-valves. The hoses passed through an open door in the second floor mechanical room, across the roof, through scaffolding erected on the 173rd Street side of the hospital as a bridge to keep the hoses off of the sidewalk, to the rented chiller, where they were attached. Because of their weight and stiffness, the hoses were lifted up to the roof with a type of crane known as a boom. The generator was parked around the corner on Grand Concourse. The chiller weighed between 27,450 pounds when empty and 28,450 pounds when full of coolant, and the trailer weighed 12,000 pounds. Because of the dangers posed by the coolant, the generator and the hoses, workers erected a fence around the unit as a safety measure to prevent access by the public.
Once installation was complete, water in the hospital's cooling system that had been warmed by passing through the coils moved through the hoses to the rented chiller. There it was cooled to the appropriate temperature, and then passed back through the hoses, and into the coil in the fan. The rented chiller was operated and inspected by a hospital engineer specially assigned to do so. The rented chiller was an integral part of the hospital's vital and extensive cooling system. The chiller was turned on and remained in use until fall. In fall 2009, the unit was disconnected and the rented components returned to the contractor.
In May 2012, after the hospital had experienced further air conditioning system failures, it again rented a chiller and a generator from Aggreko. The rented chiller was incorporated into the hospital's air conditioning system in the same way it had been in 2009. The chiller sat on top of a trailer flatbed approximately 41 feet long and 8 feet wide, parked on 173rd Street outside the hospital, near the corner of Grand Concourse. Because 173rd Street slopes between Selwyn Avenue and Grand Concourse, and the chiller will not function if not level, the trailer was "chocked up" with 6 feet by 6 feet blocks of wood stacked under it in a criss-cross pattern to make it level. After installation and connection were complete, the contractor's employee showed the hospital's lead engineer the completed work, and demonstrated how the standby chiller and generator worked. The hospital's lead engineer observed that the chiller appeared to be placed on the trailer in a different way than it had been in 2009, and it "looked a whole lot different being chocked up," but did not complain to the contractor about the installation.
Once installed, the rented chiller was connected to the hospital, used the hospital's water supply and operated as a cooling system to provide chilled air throughout the entire hospital. It pushed massive amounts of cool air throughout the hospital, and thus altered the hospital's environment in a substantial and necessary way.
Disconnection and removal of the rented chiller began on or about December 3, 2012. First, the hospital shut off the valves on its chilled water supply and return in the mechanical room, to prevent water from continuing to flow into the rented chiller. Two employees of [*4]nonparty subcontractor Miller Mechanical then unbolted and unscrewed the hoses from the T-valves, drained the water from the hoses and the chiller, and stored the hoses on the roof of the second floor mechanical room near the corner of 173rd Street and Grand Concourse.
On December 4, 2012, Miller employees arrived at the hospital to take down the scaffolding. In addition, two Aggreko employees, including the decedent, who was classified as a technician, arrived at the hospital, as did C & L's boom truck operator. The boom truck operator testified that he understood that he would be booming the hoses down from the roof. However, when he arrived, he learned for the first time that he would also be lifting the trailer and chiller so that the wood blocks leveling it could be removed from underneath it. He testified that, although he asked, no one present could tell him how much the trailer and chiller weighed. He assumed that the chiller weighed approximately 16,000 pounds, based on prior experience with Aggreko chillers. Although 23,000 pounds would be "pretty much pushing the limit" of the boom truck's capacity, he determined that the equipment he had with him that day would be sufficient to lift the chiller and trailer. In actuality, they weighed in total approximately 40,000 pounds. The C & L boom truck operator ran a chain around the chiller and trailer, and attached the chain to the boom with the use of nylon slings and a shackle. The chain was intended to be used to tie materials down, not lift them up, and the boom truck operator testified that he had never used it in this manner before.
The workers had to close 173rd Street, since the chiller took up one lane, and the truck with the boom required to bring the hoses down from the roof and lift the trailer and chiller to remove the wood chocking took up the other lane. Decedent was at the corner of 173rd Street and Grand Concourse, acting as a "flag man" to direct pedestrians away from the work area. When his coworker began removing the wood from under the trailer, a piece of wood became stuck. Decedent's co-worker testified that decedent saw him struggling with it, and came to help. While both men were working by the trailer, the chain snapped, the trailer dropped, and the chiller slid off the trailer and crushed decedent, killing him.
On or about January 16, 2013, plaintiffs commenced this action against the hospital and C & L, seeking damages, as relevant to this appeal, for violation of section 240(1) of the Labor Law. The hospital and C & L, as third-party plaintiffs, sued Aggreko, LLC, as third-party defendant, for contribution and common-law indemnification.
In November 2016, plaintiffs moved, inter alia, for partial summary judgment on their Labor Law § 240(1) claim against the hospital. The hospital, C & L, and Aggreko each moved, inter alia, for dismissal of plaintiffs' Labor Law § 240(1) claim, each arguing that Labor Law § 240(1) does not apply because decedent was not engaged in work covered by the statute.
By decision and order entered May 10, 2017, the motion court, inter alia, denied plaintiffs' motion and granted the motions for dismissal of plaintiffs' Labor Law § 240(1) claim. We now reverse, for the reasons discussed below.
Analysis
Labor Law section 240(1) imposes a nondelegable duty on owners and contractors to protect workers from the risks associated with "erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure" by placing the ultimate responsibility on them to provide "scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed" (see Panek v County of Albany, 99 NY2d 452, 457 [2003]). A failure to do so resulting in injury to a worker engaged in the type of work covered by the statute "establishes an owner or contractor's liability as a matter of law" (Zimmer v Chemung County Performing Arts, 65 NY2d 513, 521 [1985]). An owner is liable under the statute even where it exercises no control over work being performed by a contractor (Haimes v New York Tel. Co., 46 NY2d 132, 136 [1978]). Labor Law § 240(1) is to be construed as liberally as possible in order [*5]to accomplish its purpose of protecting workers (Saint v Syracuse Supply Co., 25 NY3d 117, 124 [2015]).
No one disputes that the occurrence in this case, an object falling "while being hoisted or secured, because of the absence or inadequacy of a safety device," which causes the injury or death of a worker, constitutes the type of hazard contemplated by Labor Law § 240(1) (Narducci v Manhasset Bay Assoc., 96 NY2d 259, 268 [2001]; see also Zimmer, 65 NY2d at 524 ["If proximate cause is established, the responsible parties have failed, as a matter of law, to give proper protection'"]). The only issue on this appeal, as limited by the briefs, is whether the project at issue falls under a category of work qualifying for the statute's protection.
The analysis of this question is not limited to the moment of injury, since " it is neither pragmatic nor consistent with the spirit of the statute to isolate the moment of injury and ignore the general context of the work'" (Saint, 25 NY3d at 124, quoting Prats v Port Auth. Of N.Y. & N.J., 100 NY2d 878, 882 [2003]). Thus, even where the worker is engaged in a task that is "ancillary" to work falling under one of the enumerated categories of covered work, he or she will be covered by the statute's protections where his work is "an integral part" of the larger project (Saint, 25 NY3d at 126; see also Prats at 882; Belding v Verizon N.Y., Inc., 65 AD3d 414, 415 [1st Dept 2009], affd 14 NY3d 751 [2010], supra).[FN1]
Plaintiffs assert that the project at issue in this case constituted an "alteration." For work to qualify as "altering" within the meaning of Labor Law § 240(1), it must not be "simple, routine" (Joblon, 91 NY2d at 465), cosmetic, or decorative (Munoz v DJZ Realty, LLC, 5 NY3d 747 [2005]), and it must effect "a significant physical change to the configuration or composition of the building or structure" (Joblon, 91 NY2d at 465), including significantly changing the way an important component of the building functions (Belding, 14 NY3d at 753). The change need not be permanent to qualify as an alteration (Saint, 25 NY3d at 127-128).
Here, the motion court determined that, because the work did not alter the hospital buildings' "structural integrity," it was not covered by Labor Law § 240(1). However, while we have used this language to describe what could qualify as an alteration for Labor Law purposes (Kretzschmar v New York State Urban Dev. Corp., 13 AD3d 270, 270-271 [1st Dept 2004], lv denied 5 NY3d 703 [2005]),[FN2] a change in structural integrity is not necessarily required to obtain [*6]Labor Law § 240(1) coverage. The small hole chiseled into the wall to run wires between rooms to install an electric wall clock in Joblon is unlikely to have affected the building's "structural integrity." Nevertheless, it was "significant enough" to constitute an alteration (Joblon, 91 NY2d at 465).
In cases decided by this Court and the Court of Appeals since Joblon, work being performed that affects a crucial building system has been found to constitute a significant physical change to the configuration or composition of the building. While such work may involve making holes in the building's walls or ceiling (Weininger v Hagedorn & Co., 91 NY2d 958 [1998] [running computer and telephone cable through holes punched into the ceiling in order to build a telecommunications center in newly leased space]), this is not a necessary requirement for Labor Law § 240(1) coverage where the system or component altered is important and the change is sufficiently significant. In Belding v Verizon N.Y., Inc., the Court of Appeals found that applying "bomb blast" film to lobby windows was sufficiently significant "in and of itself" to constitute an alteration because it "significantly altered the configuration or composition of the structure by changing the way the lobby windows react to explosions, impacts and the elements" (14 NY3d at 752, 753). The Court so held even though the work applying the film was a relatively brief process that required only simple tools.
In Panek v County of Albany, a worker was injured in a fall while removing two air handlers for salvage from an air traffic control tower slated for demolition. The work involved dismantling the cooling system by cutting pipes and plumbing and removing electrical distribution lines, as well as loosening the bolts affixing the air handlers to an I-beam in the ceiling (id. at 456). There is no indication that Mr. Panek's work required making any change to the air tower's "structural integrity," in the sense of making holes in the walls, floor, or ceiling, or removing structural supports, but it is clear that he was dismantling a significant building system, and the Court of Appeals accordingly found that the work he was performing constituted an alteration under Labor Law § 240(1).
Conversely, we have found work that only affected the provision of a service to a finite area within the building, or that only involved the removal of an object attached to the building with bolts but that, unlike the air handlers in Panek, was not part of an important building-wide system, did not constitute an alteration within the meaning of Labor Law § 240(1). In Pantovic v YL Realty, Inc. (117 AD3d 538, 539 [1st Dept 2014]), we found that a worker injured in a fall while feeding a portable air conditioner exhaust tube into a preexisting duct hole to "furnish the need for a personal air conditioning unit" was not conducting an alteration. Similarly, in Rhodes-Evans v 111 Chelsea LLC (44 AD3d 430 [1st Dept 2007]), we found that a Verizon technician injured in a fall while splicing fiber optic cable into an existing cable to bring telephone service to a single new tenant in the building was not conducting an alteration. In Widawski v 217 [*7]Elizabeth St. Corp. (40 AD3d 483 [1st Dept 2007]), we found that a worker injured in a fall while retrieving an eight foot tall commercial mixer from a bakery that had gone out of business by unbolting it from the floor and disconnecting it from an electrical box above it was not performing an alteration.
Here, the work being performed was a significant change to the hospital's air conditioning system, which the hospital must operate in warm weather in order to meet its regulatory requirements. Like the application of "bomb blast" film to the lobby windows in Belding, the deinstallation and removal of the rented chiller "altered the configuration or composition of the structure by changing the way the [hospital buildings] react to . . . the elements" (Belding, 14 NY3d at 753). Moreover, like the dismantling and removal of the air handlers in Panek, disconnecting and removing the rented chiller and generator was a significant undertaking, was not simple, routine, or cosmetic, and fundamentally altered the function of a significant building system, the hospital's air conditioning system. As in Panek, the project took more than a day to complete. The qualifying work in both Belding and Panek appears to have been performed by one person. In contrast, here, the work was complex enough that it required the labor of employees of the hospital, the contractor and the multiple subcontractors. It required shutting off the valves on the hospital's chilled water supply and return in the mechanical room, unbolting and unscrewing approximately 125 feet of heavy, nonbending hose from the chilled water supply and riser; draining the water from the hoses and standby chiller; dismantling the scaffolding that served as a bridge carrying the hoses from the mechanical room over the sidewalk to the chiller; dismantling the fencing around the chiller and generator; closing the street outside the hospital; using lifting equipment to lower the hoses from the roof; and using a boom, chains, shackles, slings, and hooks to raise the trailer and chiller so that the decedent and his coworker could remove the wood blocks that leveled the trailer and chiller, in order to allow for the trailer to be removed. Under these circumstances, we find that the work decedent was engaged in constituted an alteration under Labor Law § 240.
Accordingly, the order of the Supreme Court, Bronx County (Lucindo Suarez, J.), entered on or about May 10, 2017, which, to the extent appealed from as limited by the briefs, denied plaintiffs' motion for partial summary judgment on their Labor Law § 240(1) cause of action as against the hospital and granted the motions for summary judgment of the hospital, C & L, and Aggreko dismissing that cause of action, should be reversed, on the law, without costs, plaintiffs' motion granted, the motions for summary judgment dismissing plaintiffs' Labor Law § 240(1) cause of action denied, and the matter remanded to the motion court to decide those branches of the parties' motions that were not previously reached or were denied as moot due to dismissal of plaintiffs' Labor Law § 240(1) claim.
All concur.
Order, Supreme Court, Bronx County (Lucindo Suarez, J.), entered on or about May 10, 2017, reversed, on the law, without costs, plaintiffs' motion granted, the motions for summary judgment dismissing plaintiffs' Labor Law § 240(1) cause of action denied, and the matter remanded to the motion court to decide those branches of the parties' motions that were not previously reached or were denied as moot due to dismissal of plaintiffs' Labor Law § 240(1) claim.
Opinion by Gesmer, J. All concur.
Renwick, J.P., Manzanet-Daniels, Mazzarelli, Gesmer, Oing, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: SEPTEMBER 13, 2018
CLERK



Footnotes

Footnote 1:For this reason, we reject Aggreko's argument that decedent's acting as a "flag man" to direct pedestrians away from the work area excludes him from the protections of Labor Law § 240(1). Moreover, it is undisputed that he was assisting in removing wood blocks from under the chiller in order to prepare it to be removed from the site when it fell (see Joblon, 91 NY2d at 465 ["It is not important how the parties generally characterize the injured worker's role but rather what type of work the plaintiff was performing at the time of injury"]).

Footnote 2:In Kretzschmar, cited by the motion court, we affirmed dismissal of a Labor Law § 240(1) claim where an electrician was injured while removing a sign from a temporary exhibit at the Javits Center. To the extent that our noting that the work did not affect the building's "structural integrity" constituted a requirement that a building's structural integrity be affected in order for work to constitute an alteration, that rule is not good law after Belding v Verizon N.Y., Inc. (14 NY3d 751 [2010], supra), discussed below. Moreover, Kretzschmar, and the cases to which it cites, are also distinguishable from this one in that they all concerned work that effected only a cosmetic or decorative change (see Tanzer v Terzi Prods., 244 AD2d 224 [1st Dept 1997] [attaching objects to decorate a building for a television film shoot]; Perchinsky v State of New York, 232 AD2d 34 [3d Dept 1997], lv dismissed in part, denied in part 91 NY2d 812 [1999] [stringing wires to hang kites as decorations]). Maes v 408 W. 39 LLC (24 AD3d 298 [1st Dept 2005]), also relied on by defendants, is similarly inapposite, as it only concerned work which was "decorative" (id. at 300).